Receipt number AUSFCC-6145249

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CARLOS ACOSTA; HERMAN L. EZZEL;            )
STEPHEN B. GREENE; ANIKO GULYAS;           )
TIBOR DOBAI; HOSTETLER, TRACY L.;          )
HOSTETLER, GREG L., VICTOR MARTINEZ;       )
DENNIS MCLEAN;  MICHELLE MCLEAN;           )     Case No.: ___20-526 L___
JOHN J. RABER; RUTH I. RABER.;             )
BRUCE SEGAL; JANE SHUMWAY;                 )
GARY E. SIMMONS; CANDICE SPAULDING;        )
JAMES M. SWEENEY; MARIE SWEENEY;           )
ROMANUS WOLTER; JAMES H. YAGER;            )
LISA C. YAGER; STANLEY A. ZIMMERMAN;       )
and MYRIAM M. SPRINGUEL,                    )
                                           )
            Plaintiffs,                     )
                                           )
    vs.                                     )
                                           )
THE UNITED STATES OF AMERICA,               )
                                           )
            Defendant.                      )

## COMPLAINT

### JURISDICTION AND VENUE

1.  This Court has jurisdiction and venue is appropriate pursuant to 28 U.S.C. § 1491(a)(1)

(the "Tucker Act") because this action presents a claim against the United States which arises out

of the Fifth Amendment to the United States Constitution.

### THE CONSTITUTIONAL AND STATUTORY PROVISIONS
### GOVERNING THIS DISPUTE

2.  Plaintiffs' claims are based upon the (1) Fifth Amendment to the United States Constitution

prohibiting the taking of private property for public use without just compensation; (2) the National

Trails System Act of 1968, as amendmened in 1983, 16 U.S.C. § 1247(d) (the "Trails Act"); and,

(3) the Tucker Act, 28 U.S.C. § 1491(a) (the "Tucker Act").

3.  Plaintiffs seek costs and attorneys' fees incurred pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (the "URA"), 42 U.S.C. §4654(c) (2000), which provides that Plaintiffs are entitled to "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding." 42 U.S.C. §4654(c).

4.  Section 4622(a) of the URA provides the Government must also pay other expenses and costs an owner incurs including: (1) actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property; (2) actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation …; (3) actual reasonable expenses in searching for a replacement business or farm."

5.  Section 4622(d) of the URA provides the Government must also pay the costs of relocating "utility facilities" including: "(i) any electric, gas, water, steam power, or materials transmission or distribution system; (ii) any transportation system; (iii) any communications system (including cable television); and (iv) any fixtures, equipment, or other property associated with the operation, maintenance, or repair of any such system."

## STATEMENT OF FACTS

6.  This lawsuit is a Fifth Amendment takings case in which Plaintiffs are asking this Court to order the Government to pay them for land the Government took from them.

7.  The Government took Plaintiffs' land for the northern extension of the Legacy Trail between Sarasota and Venice. The Legacy Trail is a public recreational trail the Government created under the Trails Act.

8.  Seminole Gulf Railway, L.P. ("SGLR") formerly owned an easement for railroad purposes between Milepost SW 890.29 on the north side of Ashton Road and Milepost 884.70, and between

Milepost AZA 930.30 and Milepost AZA 928.21 on the north side of State Highway 780 (Fruitville Road), partly lying within the City of Sarasota, Sarasota County, Fla., with the remainder lying within unincorporated Sarasota County, Florida (the "Railroad Line"), a total distance of 7.68 miles.

9.   SGLR has not operated a railway line over this land for over ten years and last year SGLR petitioned the federal Surface Transportation Board ("STB") for authority to abandon the railroad right-of-way. The Government granted permission to abandon the Railroad Line.

10. Under the terms of the easements that created this right-of-way and Florida law, SGLR (or their successors in interest), Sarasota County, nor any future owner of the Railroad Line had or has the ability or legal right to convert this abandoned Railroad Line into a public linear park.

11. Correspondingly, SGLR had no right to sell or transfer an easement across to Plaintiffs' land to anyone.

12. But the Government wanted the land under otherwise abandoned railroad right-of-way easements (such as this Venice to Sarasota railway line) to be used for public recreation and for a possible public transportation corridor in the future.

13. To achieve this objective Congress amended the National Trails Act to add section 8(d), authorizing the STB to take owners' "revisionary" interest in land, allow the railroad to sell the owner's land to a non-railroad for public recreation and called "railbanking" and imposed two new easements for these public uses upon the owner's land.

14. On May 14, 2019, the STB issued an order (called a Notice of Interim Trail Use or Abandonment ("NITU")) invoking section 8(d) and extended the Legacy Trail north across these Sarasota landowners' property. The STB's order took these owners' reversionary right to their

land and allowed SGLR to sell an easement across these owners' land to Sarasota County for the northern extension of the Legacy Trail. STB Docket No. AB 400 (Sub No. 7X). *See* **Exhibit "A".**

15. When the Government takes private property for the benefit of the entire community the Government must justly compensate the owner whose property has been taken.[1]

16. The United States Supreme Court held that the Government's invocation of section 8(d) of the Trails Act takes an owner's private property and the Just Compensation Clause of our Constitution compels the Government to pay the owner for that property the Government took, reimburse the owner's legal fees and litigation expenses and pay the owner interest for the Government's delay in compensating these owners.[2]

17. The Government has not, however, paid or offered to pay these Plaintiffs. The only way these Plaintiffs can vindicate their constitutional right to be justly compensated is to bring this lawsuit.

18. The Federal Circuit held, the Government's liability in a Trails Act taking is established under a three-point analysis. See *Ellamae Phillips Co. v. United States*, 564 F. 3d 1367, 1373 (Fed. Cir. 2009) (citing *Preseault II*, 100 F 3d at 1533).

> [W]ho owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate;
>
> [I]f the railroad acquired only an easement, where the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and
>
> [E]ven if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that

---

[1] *See Preseault v. Coal Co. v. Mahon*, 260 U.S. 393 (1922) ("We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.") and *Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.")

[2] *See Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1 (*Preseault I*).

the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

19. Accordingly, undersigned, on behalf of these Plaintiffs, asks this Court to order the Government to pay the Plaintiffs for that property the Government took, pay interest for the Government's delay and reimburse these owners' legal fees and litigation expenses.

## THE PARTIES

I.      **The Plaintiffs**

*Carlos Acosta*

20. The Plaintiff, Carlos Acosta, individually, owns land in Sarasota County, Florida, which the Government took for the northern extension of the Legacy Trail. The Plaintiff holds title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. The Plaintiff acquired property in Sarasota County, Florida on July 19, 2012, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #2012096228. The Plaintiff's property is identified by Sarasota County as Parcel Number 0070070015.

*Herman L. Ezzell*

21. The Plaintiff, Herman L. Ezzell, individually, owns land in Sarasota County, Florida, which the Government took for the northern extension of the Legacy Trail. The Plaintiff holds title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. The Plaintiff acquired property in Sarasota County, Florida on October 1, 1986, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #1891/341. The Plaintiff's property is identified by Sarasota County as Parcel Number 2034030091.

### Stephen B. Greene

22. The Plaintiff, Stephen B. Greene, individually, owns land in Sarasota County, Florida, which the Government took for the northern extension of the Legacy Trail. The Plaintiff holds title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. The Plaintiff acquired property in Sarasota County, Florida on May 16, 2005, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #2005110848. The Plaintiff's property is identified by Sarasota County as Parcel Number 0071160053.

### Aniko Gulyas and Tibor Dobai

23. The Plaintiffs, Aniko Gulyas and Tibor Dobai, Joint Tenants with Right of Survivorship, own land in Sarasota County, Florida, which the Government took for the northern extension of the Legacy Trail. Plaintiffs hold title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. Plaintiffs acquired property in Sarasota County, Florida, on August 3, 2009, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #2009096155. Plaintiffs' property is identified by Sarasota County as Parcel Number 0054040011.

### The Hostetlers

24. The Plaintiffs, Greg L. Hostetler and Tracy L. Hostetler,  husband and wife, own land in Sarasota County, Florida, which the Government took for the northern extension of the Legacy Trail. Plaintiffs hold title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. Plaintiffs acquired property in Sarasota County, Florida, on August 1, 1987, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #1968/1162. Plaintiffs' property is identified by Sarasota County as Parcel Number 2034020026.

### Victor Martinez

25. The Plaintiff, Victor Martinez, individually, owns land in Sarasota County, Florida which the Government took for the northern extension of the Legacy Trail. The Plaintiff holds title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. The Plaintiff acquired property in Sarasota County, Florida, on February 14, 2015, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #2015023947. The Plaintiff's property is identified by Sarasota County as Parcel Number 0054040008.

### The McLeans

26. The Plaintiffs, Dennis P. and Michelle D. McLean, husband and wife, own land in Sarasota County, Florida which the Government took for the northern extension of the Legacy Trail. The Plaintiffs hold title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. Plaintiffs acquired property in Sarasota County, Florida on September 23, 2004, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #2004187206. Plaintiffs' property is identified by Sarasota County as Parcel Number 0052050013.

### The Rabers

27. The Plaintiffs, John J. and Ruth I. Raber, husband and wife, own land in Sarasota County, Florida, which the Government took for the northern extension of the Legacy Trail. The Plaintiffs hold title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. Plaintiffs acquired property in Sarasota County, Florida on November 24, 2014, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #2014141813. Plaintiffs' property is identified by Sarasota County as Parcel Number 0054040005.

### Bruce Segal

28. The Plaintiff, Bruce Segal, individually, owns land in Sarasota County, Florida which the Government took for the northern extension of the Legacy Trail. The Plaintiff holds title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. The Plaintiff acquired property in Sarasota County, Florida on May 13, 2015, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #2015098597. Plaintiff's property is identified by Sarasota County as Parcel Number 0054040009.

### Jane S. Shumway

29. The Plaintiff, Jane S. Shumway, individually, owns land in Sarasota County, Florida, which the Government took for the northern extension of the Legacy Trail. The Plaintiff holds title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. The Plaintiff acquired property in Sarasota County, Florida on September 26, 1997, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #3017/1760. Plaintiff's property is identified by Sarasota County as Parcel Number 2029150037.

### Gary E. Simmons

30. The Plaintiff, Gary E. Simmons, individually, owns land in Sarasota County, Florida which the Government took for the northern extension of the Legacy Trail. The Plaintiff holds title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. The Plaintiff acquired property in Sarasota County, Florida on April 5, 1993, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #2494/5. The Plaintiff's property is identified by Sarasota County as Parcel Number 0054040016.

### Candice Spaulding

31. The Plaintiff, Candice Spaulding, individually, owns land in Sarasota County, Florida, which the Government took for the northern extension of the Legacy Trail. The Plaintiff holds title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. The Plaintiff acquired property in Sarasota County, Florida on January 1, 1979 and January 20, 2006, by that deeds recorded in the Sarasota Recorder of Deed's office as instruments #1280/1456 and #2006022316. The Plaintiff's property is identified by Sarasota County as Parcel Number 203400021.

### The Sweeneys

32. The Plaintiffs, James M. Sweeney and Marie Sweeney, husband and wife, own land in Sarasota County, Florida which the Government took for the northern extension of the Legacy Trail. Plaintiffs hold title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. Plaintiffs acquired property in Sarasota County, Florida on June 11, 2009, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #2009072915. Plaintiffs' property is identified by Sarasota County as Parcel Number 2034020022.

### Romanus Wolter

33. The Plaintiff, Romanus Wolter, individually, owns land in Sarasota County, Florida which the Government took for the northern extension of the Legacy Trail. The Plaintiff holds title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. The Plaintiff acquired property in Sarasota County, Florida, on February 1, 2017, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #2017013559. The Plaintiff's property is identified by Sarasota County as Parcel Number 2034020020.

### The Yagers

34. The Plaintiffs, James H. and Lisa C. Yager, husband and wife, own land in Sarasota County, Florida, which the Government took for the northern extension of the Legacy Trail. The Plaintiffs hold title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. Plaintiffs acquired property in Sarasota County, Florida on May 13, 2019, by that deed recorded in the Sarasota Recorder of Deed's office as instrument #2019061658. Plaintiffs' property is identified by Sarasota County as Parcel Number 2029140009.

### Stanley A. Zimmerman and Myriam M. Springuel

35. The Plaintiffs, Stanley A. Zimmerman and Myriam M. Springuel, husband and wife, own land in Sarasota County, Florida which the Government took for the northern extension of the Legacy Trail. The Plaintiffs hold title to the fee estate in that land subject to the STB's order invoking section 8(d) of the Trails Act. Plaintiffs acquired property in Sarasota County, Florida, on September 23, 1998 by that deed recorded in the Sarasota Recorder of Deed's office as instrument #1998127797. Plaintiffs' property is identified by Sarasota County as Parcel Number 2034020010.

### All Plaintiffs

36. Plaintiffs' property abuts and underlies the Railroad Line and right-of-way, and, by reason of the STB's invocation of section 8(d) of the Trails Act, now subject to an easement for public recreation and railbanking.

37. Plaintiffs owned their property on or before May 14, 2019, which is when the STB invoked section 8(d) of the federal Trails Act.

## II.  The Defendant

38. The United States of America is the Defendant (the "Government"). The Government took the Plaintiffs' land for a public recreational trail and railbanking by an order of the STB invoking section 8(d) of the federal Trails Act.

39. The Federal Circuit, sitting *en banc*, explained:

> [T]hat Trails Act takings were the responsibility of the federal government. [W]e conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government. … The Federal Government authorized and controlled the behavior of the State [here Sarasota County] in this matter, and the consequences properly fall there."
>
> *Preseault II*, 100 F.3d at 1531.

## CAUSES OF ACTION

## <u>COUNT I</u>
## (TAKINGS CLAIM)

*The federal Government took the Plaintiffs' properties and the Just Compensation*
*Clause of the Fifth Amendment to our Constitution requires the federal*
*Government to pay the Plaintiffs for what the Government took.*

40. Plaintiffs hereby re-allege and incorporates by reference the allegations set forth above in paragraphs 1 through 38 of this Complaint.

41. The Government took the Plaintiffs' property and the Just Compensation Clause of the Fifth Amendment to our Constitution requires the Government to pay these owners for what the Government took.

42. Congress amended the Trails Act in 1983 for the explicit purpose of authorizing the ICC (now the STB) to take an owner's state-law right to unencumbered title and possession of the

owner's land. Congress intended section 8(d), when invoked, to impose new and different easements upon the owner's land and to perpetuate the STB's jurisdiction over the owner's land.[3]

43. In *Preseault I*, the Supreme Court found the Trails Act to be constitutional because it was an exercise of Congress' eminent domain authority. By exercising its eminent domain power, Congress could enact section 8(d) of the Trails Act and allow the ICC (now the STB) to redefine existing state-law property interests and take private property for public recreation and railbanking.

44. But, the Supreme Court continued, the Fifth Amendment requires the United States to justly compensate owners for the value of that property taken when the Government invokes section 8(d). Justice Brennan wrote for a unanimous Court:

> This language [section 8(d)] gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of revisionary interests… By determining interim trail use to be like discontinuance rather than abandonment, Congress prevented property interests from reverting under state law.

> *Preseault I*, 494 U.S. at 8.[4]

45. Justice O'Connor (joined by Justices Kennedy and Scalia) concurred to emphasize "[A] sovereign, 'by *ipse dixit*, may not transform private property into public property without compensation… This is the very kind of thing that the Taking Clause of the Fifth Amendment was

---

[3] *See Preseault I* and *Trevarton v. South Dakota*, 817 F. 3d 1081, 1087 (8th Cir. 2016) (holding the invocation of section 8(d) imposes a new and different easement upon the owner's land). *See also Citizens against Rails-to-Trails v. Surface Transp. Bd.*, 267 F. 3d 1144, 1149 (DC Cir. 2001) and *Nat'l Wildlife Found. v. Interstate Commerce Comm'n*, 850 F. 2d 694, 697-98 (DC Cir. 1988) (explaining that Congress intended to extinguish owners' state-law property rights).
[4] Citations omitted.

meant to prevent.'" *Id.* at 23 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1012 (1984) which in turn quoted *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980)).[5]

46. The Federal Circuit sitting *en banc* in *Preseault II*, 100 F. 3d at 1531, followed *Preseault I*, and held:

> [W]e conclude that the taking that resulted from the establishment of the recreation trail is properly laid at the doorstep of the Federal Government…In the case before use there was a similar physical entry upon the private lands of the [property owners], acting under the Federal Government's authority pursuant to the ICC's [now STB's] Order. That it was for a valued public use is not the issue. We have here a straightforward taking of private property for a public use for which just compensation must be paid.

47. In *Ellamae Phillips*, 564 F. 3d at 1373, a panel of the Federal Circuit summarized the Federal Circuit's *en banc* holding in *Preseault II* and noted the Government's liability turns upon three questions:

> (1) [W]ho owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate;
>
> (2) [I]f the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and,
>
> (3) [E]ven if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).[6]

48. It is long-settled law in Florida that a grant of property to a railroad for a right-of-way is not a grant of fee title, but only an easement for the use of the property to operate a railroad. "A right of way for a railroad is only an easement though it be conveyed by a deed." *Van Ness v. Royal*

---

[5] In *Stop the Beach Renourishment, Inc. v. Florida*, 560 U.S. 702, 713 (2010), the Court reaffirmed its holding that the Government "effect[s] a taking if they recharacterize as public property what was previously private property."
[6] *See* Note 14, *supra*.

*Phosphate Co.*, 60 Fla. 284, 53 So. 382 (Fla. 1910) (citing *Brown v. Young*, 67 Iowa 635, 29 N.W. 941).

49. Should a railroad abandon operation of a railroad over property upon which the right-of-way easement has been granted, the property "reverts" to the fee owner and the fee owner's property is unencumbered by any easement for current or future railroad use. *See Seaboard Airline Ry. v. Southern Inv. Co.*, 53 Fla. 832, 44 So. 351 (Fla. 1907); *see also Canal Authority of Florida v. Mainer*, 440 So. 2d 1304 (Fla. App. 1983); *Rogers v. United States*, 90 Fed. Cl. 418, 431, 2009 U.S. Claims LEXIS 384 (Fed. Cl. 2009) ("Under Florida law, title to the land bordering an easement extends to the centerline of the easement"); *Smith v. Horn*, 70 Fla. 435, 436 (Fla. 1915).

50. Under the terms of the easements that created this right-of-way and Florida law, the Plaintiffs: (1) owned the land and the railroad held only an easement; (2) the railroad held only a right to operate a railway across the strip of land and the railroad did not have any right to sell or transfer the land to a non-railroad for public recreation or railbanking; and, (3) whatever interest SGLR and its successor railroads held in the right-of-way easement unequivocally terminated when the railroad no longer operated a railway across the strip land.

51. An easement for the operation of a railroad is entirely different than an easement for public recreation. The Federal Circuit explained this fundamental point when it held:

> It is elementary law that if the Government uses (or authorizes the use of – a point to be considered later) and existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new use does not change the equation – the railroad cannot give what it does not have.
>
> And it appears beyond cavil that use of these easements for a recreation trail – for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway – is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different

burdens. In the one case there was an occasional train passing through (no depots or turntable or other appurtenances are involved on these rights of way). In other other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short of long periods of time. In the one case, the landowner could make such uses of the property as were not inconsistent with the railroad's use, crossing over the tracks, putting a fruit stand on one edge of the property, or whatever. In the other, the government fenced the trail in such a way as to deny that access.

Some might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point. The landowner's grant authorized one set of uses, not the other. Under the law, it is the landowner's intention as expressed in the grant that defines the burden to which the land will be subject. The Government does not dispute this proposition – the Government agrees that, consistent with the state's law, the landowner's grant defines the burden with which the land is burdened.

<em>Toews</em>, 376 F. 3d at 1376-77.

52. But for the STB invoking section 8(d) of the Trails Act, the Plaintiffs would have held and enjoyed unencumbered title and these owners would have had the exclusive right to possess their property free of any easement for recreational trail use or railbanking.

53. The Government's liability was established when the STB issued its order invoking section 8(d) of the Trails Act on May 14, 2019. In *Caldwell v. United States*, 391 F. 3d 1226 (Fed. Cir. 2004), *Barclay v. United States*, 443 F. 3d 1368 (2006), and *Illig v. United States*, 274 Fed. Appx. 883 (2008), *cert. denied* 557 U.S. 935 (2009). *See also* Solicitor General Kagan's Brief for the United States in Opposition to Petition for Writ of Certiorari, *Illig v. United States*, 2009 WL 1526939. In *Barclay*, the Federal Circuit held that an owner's right to compensation in a Trails Act taking arises when the STB first issues its order invoking section 8(d). Specifically, Judge Dyk of the Federal Circuit wrote:

The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. Abandonment is suspended and the revisionary interest is blocked "when the railroad and trail operator communicate to the STB their intention to negotiate a

trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)" of the Trails Act. We conclude that "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law revisionary interests in the right of way. Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU.

*Barclay*, 443 F. 3d at 1373.[7]

54. The Plaintiffs' right to be justly compensated for that property the Government took from them does not depend upon whether (or when) the railroad and a trail-user reach some agreement, transferred the right-of-way or when the trail-user builds a public recreational trail across these owners' land. The Government's liability for a Fifth Amendment taking is defined by what the owner lost, not what the taker gained. *See* Justice Holmes decision for a unanimous Supreme Court in *Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910) ("And the question is, What has the owner lost? Not, What has the taker gained?") *See also First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 321-22 (1987) ("a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change")(quoting *Pennsylvania Coal*, 260 U.S. at 416).

55. The Plaintiffs lost their right to unencumbered title and exclusive possession of their land when the STB invoked Section 8(d) on May 14, 2019.

56. The Federal Circuit and the Supreme Court hold the STB's invocation of section 8(d) takes an owner's state-law right to unencumbered title and exclusive possession of the owner's land and this dispossession of the owner's state-law right to use their land defines the nature of the Government's taking – and the measure of compensation the owner is due. In *Ladd v. United*

---

[7] *See also Ladd v. United States*, 630 F. 3d 1015, 1020 (Fed. Cir. 2010)(*Ladd I*) (rehearing denied, 646 F. 3d 910 (Fed. Cir. 2011)); *Ladd v. United States*, 713 F. 3d 648, 652 (Fed. Cir. 2013) (*Ladd II*).

*States*, 630 F. 3d 1015, 1024-25 (Fed. Cir. 2010) (*Ladd I*) (rehearing denied in *Ladd v. U.S.*, 646 F. 3d 910 (Fed. Cir. May 26, 2011)), the Federal Circuit held:

> Hence it is irrelevant that no trail use agreement has been reached and that no recreational trail has been established. *** "a taking occurs when the owner is deprived of use of the property… by blocking the easement reversion. While the taking may be abandoned… by the termination of the NITU[,] the accrual date of a single taking remains fixed." *Caldwell*, 391 F. 3d at 1235. We further explained: "The NITU marks the 'finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law revisionary interests when issued." *Id*. Thus, the NITY forestalls or forecloses the landowners' right to unencumbered possession of the property. *Cf. Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987) ("To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather… 'a mere restriction on its use,' is to use words in a manner that deprives them of all their ordinary meaning.").[8]

57. By virtue of the STB invoking section 8(d), SGLR has entered into an agreement with Sarasota County to transfer this abandoned railroad right-of-way to Sarasota County for a northern extension to the existing Legacy Trail.

58. That this land was taken from Plaintiffs for a public amenity such as a public recreational trail does not mitigate the Government's constitutional obligation to justly compensate these owners. Justice Holmes cautioned, "[w]e are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving that desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). Similarly, Justice Black wrote, "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar

---

[8] Internal citations omitted. *See also Navajo Nation v. United States*, 631 F. 3d 1268, 1275 (Fed. Cir. 2011), in which the Federal Circuit affirmed its holding in *Ladd I* as "explaining that a takings claim accrues when the government takes action which deprives landowners of 'possession of their property unencumbered by [an] easement,' regardless of whether third parties ever take physical possession of that easement" and its holding in *Caldwell* as "concluding that any taking occurred when the government took action preventing landowners' state law reversionary interests in a railroad right-of-way from vesting, not when subsequent actions by third parties caused the right-of-way to be converted to an interim trail for recreational use."

Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *see also Monongahela Nav. Co. v. United States*, 148 U.S. 312, 324 (1983), "the right to compensation is an incident to the exercise of that power [of eminent domain]; that the one is so inseparably connected with the other that they may be said to exist, not as separate and distinct principles, but as parts of one and the same principle."[9]

59. The Fifth Amendment requirement of justly compensating an owner from whom the Government takes property includes: (a) the full fair market value of the property taken as of the date it was appropriated by the Government – fair market value includes not only the value of the land physically confiscated but also any "severance damages" or loss in value to the property owner's entire parcel caused by the Government's taking; and, (b) payment of an additional amount necessary to compensate the property owner for the Government's delay in paying the property owner "just compensation."

60. The Supreme Court held, "The compensation to which the owner is entitled is the full and perfect equivalent of the property taken. It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken. He is entitled to damages inflicted by the taking." *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299 (1923).[10]

61. The Government's obligation to pay interest begins when the STB first invokes § 1247(d). Here, that date is May 14, 2019. The Government must pay interest calculated at the Moody's Aaa rate from May 14, 2019, until the United States Treasury actually pays the Plaintiffs. *See Miller v. United States*, 620 F. 2d 712 (Ct. Cl. 1980); *Pitcairn v. United States*, 547 F. 2d 1106 (Ct. Cl.

---

[9] Citing *Pumpelly v. Green Bay Co.*, 80 U.S. 166 (1871).
[10] Citing *Mononhagela*, 148 U.S. at 327.

1976); *Tektronix, Inc. v. United States*, 575 F. 2d 832 (Ct. Cl. 1978), *cert. denied*, 439 U.S. 1048;

and, *Georgia Pacific v. United States*, 640 F. 2d 328 (Ct. Cl. 1980); *Miller v. United States*, Court

of Federal Claims No. 03-2489L (Order of August 22, 2006) at *2; *Biery v. United States*, Court

of Federal Claims No's. 07-693L & 07-675L, 2012 WL 5914521 at *4 (Fed. Cl. Nov. 27, 2012);

*Love Terminal Partners v. United States*, 126 Fed. Cl. 389 (2016); and, *Sears v. United States*, 124

Fed. Cl. 730 (2016).

62. The Government has neither instituted any condemnation proceeding against Plaintiffs nor

pair, nor offered to pay, Plaintiffs for the property it has taken.


## COUNT II
## (DAMAGES UNDER UNIFORM RELOCATION ACT)

63. Plaintiffs hereby re-allege and incorporates by reference the allegations set forth above in

paragraphs 1 through 61 of this Complaint.

64. The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970,

42 U.S.C. 4654(c) (URA) (Pub. L. 91-646; 84 Stat. 1894), requires the Government to reimburse

the Plaintiffs the "reasonable costs, disbursements and expenses, including reasonable attorney,

appraisal and engineering fees, actually incurred because of [the] proceeding."

65. Section 4622(a) of the URA provides the Government must also pay other expenses and

costs an owner incurs including: (1) actual reasonable expenses in moving himself, his family,

business, farm operation, or other personal property; (2) actual direct losses of tangible personal

property as a result of moving or discontinuing a business or farm operation…(3) actual reasonable

expenses in searching for a replacement business or farm."

66. Section 4622(d) of the URA provides the Government must also pay the costs of relocating

"utility facilities" including: "(i) any electric, gas, water, steam power, or materials transmission

or distribution system; (ii) any transportation system; (iii) any communications system (including cable television); and, (iv) any fixtures, equipment, or other property associated with the operation, maintenance, or repair of any such system."

67. The Plaintiffs have incurred those costs and expenses which the URA requires the Government to pay and reimburse the Plaintiffs.

## RELIEF REQUESTED

For those reasons set forth above, the Plaintiffs respectfully request this Court to enter a judgment granting Plaintiffs the following relief and order the Government to:

1. Pay the Plaintiffs the full fair-market value of the property taken by the Government, including any "severance damages" and loss in value to the property suffered by Plaintiff.

2. Pay Plaintiffs compensation for the delay between the Government took the Plaintiffs' property on May 14, 2019, and the actual date when the Government pays these owners just compensation.

3. Reimburse the Plaintiffs' litigation costs and attorneys' fees as provided in URA § 4654(c), which includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

4. Award such further relief as this Court may deem just and proper.

Date: April 28, 2020.

Respectfully submitted,

**MAGLIO CHRISTOPHER & TOALE, PA**

Christina E. Unkel, Esq.
1605 Main Street, Suite 710
Sarasota, Florida 34236
cunkel@mctlaw.com
ddrabina@mctlaw.com
lwilliams@mctlaw.com
Telephone: 888-952-5242
Fax: 877-952-5042
*Attorneys for Plaintiffs*

47006
DO

SERVICE DATE – MAY 14, 2019

SURFACE TRANSPORTATION BOARD

DECISION AND NOTICE OF INTERIM TRAIL USE OR ABANDONMENT

Docket No. AB 400 (Sub-No. 7X)

SEMINOLE GULF RAILWAY, L.P.—EXEMPT ABANDONMENT—
IN SARASOTA COUNTY, FLA.

Decided:  May 13, 2019

By filings dated March 8, 2019, and March 26, 2019, Seminole Gulf Railway, L.P. (SGLR), filed a verified notice of exemption under 49 C.F.R. pt. 1152 subpart F—Exempt Abandonments to abandon an approximately 7.68-mile segment of its rail line known as the Venice Branch.  The segment to be abandoned extends between milepost SW 890.29 on the north side of Ashton Road and milepost SW 884.70, and between milepost AZA 930.30 and milepost AZA 928.21 on the north side of State Highway 780 (Fruitville Road), partly lying within the City of Sarasota, Sarasota County, Fla., with the remainder lying within unincorporated Sarasota County (the Line).  Notice of the exemption was served and published in the Federal Register on April 15, 2019 (84 Fed. Reg. 15,278).  The exemption is scheduled to become effective on May 15, 2019.

The Board's Office of Environmental Analysis (OEA) served an Environmental Assessment (EA) on April 19, 2019, recommending that two conditions be imposed on any decision granting abandonment authority.  In the EA, OEA stated that the Florida State Historic Preservation Office (SHPO), by letter dated April 16, 2019, informed OEA that the proposed abandonment is unlikely to affect historic properties but recommended adding to any decision granting abandonment authority a condition requiring SGLR to immediately stop salvaging the rail line if unanticipated discoveries of prehistoric and historic artifacts or human remains that could be associated with Native American, early European, or American settlement are encountered during salvage activities.

Considering information provided by SGLR and the SHPO, OEA determined that no historic properties would be affected by the proposed abandonment, but found the SHPO's recommended condition appropriate and reasonable.  Accordingly, OEA recommended a condition providing that, if prehistoric or historic artifacts (such as pottery or ceramics, projectile points, dugout canoes, metal implements, historic building materials, or any other physical remains that could be associated with Native American, early European, or American settlement) or unmarked human remains are encountered at any time within the project site area, SGLR shall cease all activities involving subsurface disturbance in the vicinity of the discovery, contact both OEA and the Florida Department of State, Division of Historical Resources, Compliance Review Section, and resume salvage activities within the vicinity of the discovery when it receives appropriate authorization.

EXHIBIT "A"

OEA also stated that the National Geodetic Survey (NGS) identified 11 geodetic station markers that may be located within the area of the proposed abandonment.  Accordingly, OEA recommended that SGLR be required to consult with the NGS and notify NGS at least 90 days prior to beginning any salvage activities that will disturb or destroy any geodetic station marker.

OEA issued its Final EA on May 10, 2019, noting that no comments to the EA were received and recommending again that the two conditions recommended in the EA be imposed.  Accordingly, based on OEA's recommendation, the conditions proposed in the EA will be imposed.

In the EA, OEA stated that the right-of-way may be suitable for other public use following abandonment and salvage of the Line.  On April 22, 2019, the Sarasota County Board of County Commissioners (the County) filed a request for issuance of a notice of interim trail use or abandonment (NITU) to negotiate with SGLR for acquisition of the Line for use as a trail under the National Trails System Act (Trails Act), 16 U.S.C.§ 1247(d), and for a public use condition under 49 U.S.C. § 10905.  In a response filed on April 26, 2019, SGLR notified the Board that it is willing to negotiate an agreement for interim trail use with the County and takes no position on the request for a public use condition.

With respect to its request for issuance of a NITU, pursuant to 49 C.F.R. § 1152.29, the County submitted a statement of willingness to assume financial responsibility for the right-of-way and acknowledged that the use of the right-of-way for trail purposes is subject to possible future reconstruction and reactivation of the right-of-way for rail service.  Because the County's request complies with the requirements of 49 C.F.R. § 1152.29 and SGLR is willing to negotiate for trail use, a NITU will be issued.  The parties may negotiate an interim trail use/rail banking agreement for the right-of-way during the 180-day period prescribed below.  If an interim trail use agreement is reached (and thus, interim trail use is established) the parties shall jointly notify the Board within 10 days that an agreement has been reached.  49 C.F.R. § 1152.29(d)(2) and (h).  If no agreement is reached within 180 days, SGLR may fully abandon the Line, subject to any outstanding conditions.  49 C.F.R. § 1152.29(d)(1).  Use of the right-of-way for trail purposes is subject to possible future reconstruction and reactivation of the right-of-way for rail service.

As an alternative to interim trail use under the Trails Act, the right-of-way may be acquired for public use as a trail under 49 U.S.C. § 10905.  See Rail Abans.—Use of Rights-of-Way as Trails, 2 I.C.C.2d 591, 609 (1986).  Under § 10905, the Board may prohibit the disposal of rail properties that are proposed to be abandoned and are appropriate for public purposes for a period of not more than 180 days after the effective date of the decision approving or exempting the abandonment.  Here, the County asks that SGLR be prohibited from disposing of the corridor, other than the tracks, ties, and signal equipment, except for public use on reasonable terms, for a 180-day period from the effective date of the abandonment authorization.  The County states that the right-of-way would make an excellent recreational trail and that

EXHIBIT "A"

conversion to a trail would be consistent with local plans and would extend an existing regional trail network. The County also asks that SGLR be prohibited from removing or destroying potential trail-related structures such as bridges, trestles, culverts, and tunnels, because these structures have considerable value for public purposes. The County states that a 180-day period is needed to allow time to consummate a trail use agreement with SGLR.

To justify a public use condition, a party must set forth: (i) the condition sought; (ii) the public importance of the condition; (iii) the period of time for which the condition would be effective; and (iv) justification for the imposition of the period of time requested. 49 C.F.R. § 1152.28(a)(2). Because the County has satisfied these requirements, a 180-day public use condition will be imposed, requiring SGLR to keep intact the right-of-way (including trail-related structures such as bridges, trestles, culverts, and tunnels) and to refrain from disposing of the corridor, other than tracks, ties, and signal equipment, commencing from May 15, 2019, the effective date of the exemption.

When proper requests for interim trail use/rail banking and public use conditions are made, it is the Board's policy to impose both conditions concurrently, subject to the execution of a trail use agreement. Here, however, while both conditions will be imposed at this time, the public use condition will expire on November 11, 2019, while the trail use negotiating period will run 180 days from the service date of this decision and notice, until November 10, 2019. If a trail use agreement is reached for a portion of the right-of-way prior to November 10, 2019, SGLR must keep the remaining right-of-way intact for the remainder of the 180-day public use condition period to permit public use negotiations. Also, a public use condition is not imposed for the benefit of any one potential purchaser but rather to provide an opportunity for any interested person to acquire the right-of-way that has been found suitable for public purposes, including trail use. Therefore, with respect to the public use condition, SGLR is not required to deal exclusively with the County but may engage in negotiations with other interested persons.

This decision, and the proposed abandonment if implemented as conditioned, will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1. This proceeding is reopened.

2. Upon reconsideration, the notice served and published in the Federal Register on April 15, 2019, exempting the abandonment of the Line described above is modified to the extent necessary to implement interim trail use/rail banking as set forth below to permit the County to negotiate with SGLR for trail use for the Line for a period of 180 days from the service date of this decision and notice, until November 10, 2019, and to permit public use negotiations as set forth below for the Line for a period of 180 days commencing from the effective date of the exemption, until November 11, 2019. The abandonment is also subject to

EXHIBIT "A"

the conditions that: (a) if prehistoric or historic artifacts (such as pottery or ceramics, projectile points, dugout canoes, metal implements, historic building materials, or any other physical remains that could be associated with Native American, early European, or American settlement) or unmarked human remains are encountered at any time within the project site area, SGLR shall (i) cease all activities involving subsurface disturbance in the vicinity of the discovery, (ii) contact both OEA and the Florida Department of State, Division of Historical Resources, Compliance Review Section at (850) 245-6333, and (iii) resume salvage activities within the vicinity of the discovery when it receives appropriate authorization; and (b) SGLR shall consult with NGS and notify NGS at least 90 days prior to beginning salvage activities that will disturb or destroy any geodetic station markers.

3. Consistent with the public use and interim trail/rail banking conditions imposed in this decision and notice, SGLR may discontinue service. SGLR shall keep intact the right-of-way for the Line including potential trail-related structures on the Line such as bridges, trestles, culverts, and tunnels, for a period of 180 days from the effective date of the exemption, until November 11, 2019, to enable any state or local government agency, or other interested person, to negotiate the acquisition of the right-of-way for public use. If an interim trail use/rail banking agreement is executed before expiration of the 180-day public use condition period, the public use condition will expire to the extent the trail use/rail banking agreement covers the same portion of the right-of-way.

4. If an interim trail use/rail banking agreement is reached, it must require the trail sponsor to assume, for the term of the agreement, full responsibility for: (i) managing the right-of-way; (ii) any legal liability arising out of the transfer or use of the right-of-way (unless the sponsor is immune from liability, in which case it need only indemnify the railroad against any potential liability); and (iii) the payment of any and all taxes that may be levied or assessed against the right-of-way.

5. Interim trail use/rail banking is subject to possible future reconstruction and reactivation of the right-of-way for rail service and to the trail sponsor's continuing to meet its responsibilities for the right-of-way described in paragraph 4 above.

6. If an interim trail use agreement is reached (and thus, interim trail use is established), the parties shall jointly notify the Board within 10 days that an agreement has been reached. See 49 C.F.R. § 1152.29(d)(2) and (h).

7. If interim trail use is implemented, and subsequently the trail sponsor intends to terminate trail use on all or any portion of the right-of-way covered by the interim trail use agreement, it must send the Board a copy of this decision and notice and request that it be vacated on a specified date.

8. If an agreement for interim trail use/rail banking is reached by November 10, 2019, for the portion of the right-of-way subject to the NITU, interim trail use may be implemented. If

4

EXHIBIT "A"

Docket No. AB 400 (Sub-No. 7X)

no agreement is reached, SGLR may fully abandon the Line, subject to any outstanding conditions.

9.  This decision and notice is effective on its service date.

By the Board, Allison C. Davis, Acting Director, Office of Proceedings.

5

EXHIBIT "A"